76 F.3d 1381
 64 USLW 2485
 Debra NIXON, Johnny Griffin, Sr., Bill Brown, Juan Jimenez,
Sara Ramirez, and Marshall Chavez, on behalf of
themselves and all others similarly
situated, Plaintiffs-Appellees,
v.
KENT COUNTY, Thomas Shearer, Maurice DeJonge, John Boerema,
and William Forsyth, Defendants-Appellants.
 No. 93-1456.
 United States Court of Appeals,
Sixth Circuit.
 Reargued June 14, 1995.
Decided Feb. 2, 1996.
 
 David E. Hulswit, Jr. (argued and briefed), Pinsky, Smith, Fayette & Hulswit, Grand Rapids, MI, James R. Rinck (briefed), James R. Rinck Law Offices, Grand Rapids, MI, for Debra Nixon, Johnny Griffin, Sr., Bill Brown, Juan Jimenez, Sara Ramirez and Marshall Chavez.
 Mark S. Allard (argued and briefed), Jon F. DeWitt, Kevin Abraham Rynbrandt, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Kent County, Thomas Shearer, Maurice DeJonge, John Boerema, William A. Forsyth and Kent County Apportionment Com'n.
 Jacqueline A. Berrien (argued and briefed), New York City, for NAACP Legal Defense and Educ. Fund, Inc.
 Before: MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, MILBURN, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, and MOORE, Circuit Judges.
 SUHRHEINRICH, J., delivered the opinion of the court, in which MERRITT, C.J., KENNEDY, MILBURN, NELSON, RYAN, BOGGS, NORRIS, SILER, and BATCHELDER, JJ., joined. KEITH, J. (pp. 1393-1403), delivered a separate dissenting opinion, in which JONES and DAUGHTREY, JJ., joined and in which MARTIN and MOORE, JJ., joined in Parts I, II, and IIIA. MARTIN (p. 1403), JONES (pp. 1403-04), DAUGHTREY (p. 1404), and MOORE (p. 1404), JJ., delivered separate dissenting opinions, with Judge MARTIN also joining in Judge JONES' dissent.
 SUHRHEINRICH, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 Section 2 of the Voting Rights Act, as amended, prohibits any voting practice or procedure which results in "a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [language]." 42 U.S.C. § 1973(a)(1988). Members of a minority group may establish a violation of this provision if they can show that as a result of a challenged practice or procedure, the political processes leading to nomination or election in the State or political subdivision "are not equally open to participation by members of a class of citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. § 1973(b). The question before the en banc court in this interlocutory appeal is whether members of two protected minority groups, each of insufficient numbers individually to make a prima facie case of voting dilution under the Voting Rights Act, may collectively seek § 2 protection by forming a "coalition" of minorities.
 
 
 2
 Plaintiffs, three African Americans and three persons of Hispanic national origin, brought a class action suit against defendant Kent County and the individual members of the Kent County Apportionment Committee alleging that the redistricting plan the committee proposed following the 1990 census violated § 2 of the Voting Rights Act by diluting minority influence. The district court denied defendants' motion to dismiss for failure to state a claim, but granted their motion to certify the question of whether two protected minority groups may aggregate to pursue a § 2 vote dilution cause of action.
 
 
 3
 A divided panel of this court held that protected minorities may join together and be treated as a single "protected class" under § 2. The majority reasoned that the ambiguity of the term "class of citizens," coupled with the absence of any statutory language or legislative history to the contrary meant that classes of minorities from different ethnic backgrounds may aggregate to meet § 2 requirements. It also held that the context of the 1982 amendments supported its conclusion that the broad term "class of citizens" includes minority coalitions. The dissent stated that because the text of the Act does not recognize such suits, and nothing in the legislative history reflected even the possibility of such suits, the plaintiffs' action was precluded.
 
 
 4
 The Supreme Court explicitly avoided resolving the issue before us in Growe v. Emison, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), a case in which the Court reversed a district court finding that a Minnesota redistricting plan violated the Voting Rights Act. The Growe suit was brought by a group of plaintiffs which included African Americans and Native Americans. The Court assumed without deciding that a coalition suit was permissible, and dismissed because the Gingles criteria[1] could not be satisfied. Id. 507 U.S. at 41, 113 S.Ct. at 1085.[2] Only the Fifth Circuit has expressly held that coalition suits are permitted, provided that the plaintiffs can demonstrate the presence of the three Gingles factors. See Campos v. City of Baytown, 840 F.2d 1240 (5th Cir.), reh'g denied, 849 F.2d 943 (1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); see also League of United Latin Am. Citizens v. Midland Indep. Sch. Dist., 812 F.2d 1494 (5th Cir.) (assuming African Americans and Mexican Americans could aggregate to pursue vote dilution claim), vacated and rev'd on state law grounds, 829 F.2d 546 (5th Cir.1987)(en banc)(hereinafter LULAC ). All of the other circuits addressing minority coalition claims under § 2 have simply assumed they are permissible as long as the Gingles test is satisfied. See, e.g., Bridgeport Coalition for Fair Representation v. City of Bridgeport, 26 F.3d 271, 275 (2d Cir.), cert. granted and judgment vacated on different grounds, --- U.S. ----, 115 S.Ct. 35, 129 L.Ed.2d 931 (1994); Badillo v. City of Stockton, 956 F.2d 884, 891 (9th Cir.1992); Concerned Citizens of Hardee County v. Hardee County Bd. of Comm'rs, 906 F.2d 524, 526 (11th Cir.1990)(citing Campos and LULAC ); Butts v. City of New York, 779 F.2d 141, 149 n. 5 (2d Cir.1985)(employing analysis from the Gingles district court opinion), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986).
 
 
 5
 Despite the tacit recognition of coalition suits by these courts, the legitimacy of such claims under § 2 has not gone unchallenged. In Campos, the defendants' petition for rehearing by the Fifth Circuit en banc was denied over the vigorous dissent of Judge Higginbotham, who sought to have the entire court consider the issue. See Campos v. City of Baytown, 849 F.2d 943, 945 (5th Cir.1988) (hereinafter Campos Reh'g ) (Higginbotham, J., dissenting from denial of reh'g en banc); LULAC, 812 F.2d at 1503 (Higginbotham, J., dissenting). See also League of United Latin Am. Citizens v. Clements, 999 F.2d 831, 894 & n. 2 (5th Cir.1993) (en banc) (Jones, J., concurring) (urging en banc court to "lay to rest minority coalition theory of vote dilution claims"; endorsing Judge Higginbotham's dissents in Campos Reh'g and LULAC ), cert. denied, --- U.S. ----, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).
 
 II. FACTS[3]
 
 6
 Kent County, Michigan, is governed by a Board of Commissioners, and each member is elected from a single-member district.[4] The Board has consisted of twenty-one members since its inception in 1968. In accordance with Michigan law, which requires redistricting after every United States census count, see Mich. Comp. Laws § 46.401 (1979), the five-member Kent County Apportionment Commission[5] met upon publication of the 1990 census.
 
 
 7
 The 1990 United States census revealed that the population of Kent County, Michigan, grew from approximately 440,000 in 1980 to a population of 500,631 in 1990. Of that number, 438,294, or 87.5%, are white; 14,684, or 2.9%, are Hispanic American; and 39,432, or 7.9 %, are African American. African Americans and Hispanic Americans make up 9.2% of the voting age population in Kent County. Although the population of Kent County increased between censuses, the Apportionment Committee approved a plan that reduced the number of districts, and therefore Board members, from twenty-one to nineteen. The new plan established one district made up of a 78.3% minority population, district 17, which included 66.5% African Americans and 11.8% Hispanic Americans. No other district included significant numbers of both. Defendants submitted evidence that the twenty-one district apportionment would have been malapportioned after the 1990 census, with district 6 containing more than 29,000 persons and district 17 containing less than 21,000 persons.
 
 
 8
 Plaintiffs charged defendants of packing district 17 with an excessive percentage of minority voters and of splitting the remaining minority voters among districts dominated by large white majorities. Plaintiffs proposed instead a plan that retained twenty-one districts, two of which contained a majority population of minorities, at 68% and 65%, respectively. One of the districts included both African Americans and Hispanic Americans in order to establish sufficient numbers and satisfactory geographical compactness.
 
 
 9
 Plaintiffs sought a preliminary injunction to enjoin defendants from implementing their plan and to require defendants to execute an apportionment plan that would include two districts in which minorities constituted voting majorities. The district court denied plaintiffs' motion on March 19, 1992, finding little likelihood of success on the merits because plaintiffs failed to demonstrate that Hispanics and African Americans were a politically cohesive group, as required by Gingles. Nixon v. Kent County, 790 F.Supp. 738 (W.D.Mich.1992). Defendants later filed a motion to dismiss, arguing that coalition claims are not covered by § 2. The district court denied the motion on December 23, 1992, holding that aggregation of minorities is permissible under the Act. The same day, the district court also granted defendants' motion to certify the issue to this court pursuant to 28 U.S.C. § 1292(b) (1988).
 
 
 10
 On March 30, 1993, this court granted defendants' petition for permission to appeal. The NAACP Legal Defense and Educational Fund, Inc. ("NAACP") was allowed to file an amicus brief. The panel issued its original opinion on September 12, 1994, affirming the district court. Nixon v. Kent County, 34 F.3d 369 (6th Cir.1994)(vacated). The panel decision was vacated and en banc review granted by order of November 21, 1994. Nixon v. Kent County, 34 F.3d 383 (6th Cir.1994)(en banc).
 
 III. THE STATUTE
 
 11
 Section 2 of the Voting Rights Act provides:
 
 
 12
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 13
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 14
 42 U.S.C. § 1973 (1988)(emphasis in original).[6]
 
 
 15
 In Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court interpreted the language of § 2 as requiring three "necessary preconditions" for determining whether use of a multimember voting district system has the effect of diluting a minority group's voting power in violation of § 2:
 
 
 16
 First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, ... to defeat the minority's preferred candidate.
 
 
 17
 Id. at 50-51, 106 S.Ct. at 2766-67 (internal citations omitted). Once these three "preconditions" are satisfied, the plaintiff class must also show that, under the "totality of circumstances," it does not possess the same opportunities to participate in the political process as other voters. Id. at 48-49 & n. 15, 106 S.Ct. at 2765-66 & n. 15; Clarke v. City of Cincinnati, 40 F.3d 807, 811 (6th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995).
 
 
 18
 Although Gingles did not decide whether these "necessary preconditions" would apply to single-member districts, 478 U.S. at 47 n. 12, 106 S.Ct. at 2764-65 n. 12, the Supreme Court extended Gingles to § 2 claims involving single-member districts in Growe, 507 U.S. at 40, 113 S.Ct. at 1084.
 
 
 19
 In this appeal, we consider the threshold issue of whether two minority groups may make a collective attempt to satisfy the Gingles criteria to state a vote dilution claim.
 
 IV. ANALYSIS
 A. The Text
 
 20
 We review the decision of the district court concerning questions of statutory interpretation de novo. In re First Truck Lines, Inc. v. Noland, 48 F.3d 210, 213 (6th Cir.1995), cert. granted, --- U.S. ----, 116 S.Ct. 558, 133 L.Ed.2d 458 (1995)(No. 95-323). "The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.' " Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 409, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993)(quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)); Noland, 48 F.3d at 213-14. Our interpretation of legislative acts is limited, for "[i]f the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." Reves v. Ernst & Young, 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) (citations and internal quotations omitted).
 
 
 21
 Departure from the language of the legislature and resort to judicially created rules of statutory construction is appropriate only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters ... or when the statutory language is ambiguous." Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 842 (6th Cir.1994) (citation and internal quotations omitted). See also Noland, 48 F.3d at 214. The plain meaning of the statute controls the court's interpretation in all other instances. Kelley, 17 F.3d at 842.
 
 
 22
 With these principles in mind, we turn to the language of the statute. Even the most cursory examination reveals that § 2 of the Voting Rights Act does not mention minority coalitions, either expressly or conceptually. Moreover, § 2 consistently speaks of a "class" in the singular. The Act protects a citizen's right to vote from infringement because of, or "on account of," that individual's race or color or membership in a protected language minority. See 42 U.S.C. § 1973(a). Subsection (b) of § 1973, which describes the proof necessary to establish a violation, requires a showing "that the political processes ... are not equally open to participation by members of a class of citizens protected by subsection (a)...." 42 U.S.C. § 1973(b)(emphasis added). Nothing in the clear, unambiguous language of § 2 allows or even recognizes the application of the Voting Rights Act to coalitions as urged by plaintiffs.
 
 
 23
 If Congress had intended to sanction coalition suits, the statute would read "participation by members of the classes of citizens protected by subsection (a)" or more simply, "participation by citizens protected by subsection (a)." Moreover, the central element necessary to establish a violation is a showing that "its members have less opportunity than other members of the electorate ...," id. (emphasis added), not that "their members have less opportunity." Finally, Congress declared in subsection (b) that "[t]he extent to which members of a protected class have been elected" is one circumstance which may be considered. Id. (emphasis added). As in prior instances, if Congress had intended to authorize coalition suits, the phrase would more naturally read: "[t]he extent to which members of the protected classes have been elected." See Clements, 999 F.2d at 894 (Jones, J., concurring) (1982 amendment offers no textual support for a minority aggregation theory; "[i]t speaks only of 'class of citizens' and 'a protected class'... [h]ad Congress chosen explicitly to protect minority coalitions it could have done so by defining the 'results' test in terms of protected classes of citizens"). "The Legislature must be presumed to know the meaning of words, and to have used the words advisedly." 73 Am.Jur.2d Statutes § 393 (1974). See also Pope by Pope v. East Brunswick Bd. of Educ., 12 F.3d 1244, 1249 (3d Cir.1993).
 
 
 24
 A textual analysis of § 2 reveals no word or phrase which reasonably supports combining separately protected minorities. Thus, as aptly expressed by Judge Jones of the Fifth Circuit:
 
 
 25
 According to customary legal analysis, there should be no need to discuss the minority coalition theory of vote dilution because the text of the Voting Rights Act does not support it.
 
 
 26
 Clements, 999 F.2d at 894 (Jones, J., concurring). See also Kelley, 17 F.3d at 842.
 
 B. Other Authority
 
 27
 Because the statute is clear, resort to the legislative history is unnecessary and improper. In fact, neither party contends that the extensive legislative history of the Act contains any direct evidence that Congress even contemplated coalition suits, far less intended them. The committee report for the 1975 amendments does not make any reference, implicit or explicit, to the issue of aggregation.[7] See S.Rep. No. 295, 94th Cong., 1st Sess. 1 (1975) U.S.Code Cong. & Admin.News 1975 p. 774. Neither do the subsequent reports for the 1982 amendments.[8] See S.Rep. No. 417, 97th Cong., 2d Sess. 28 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 205. See also Katharine I. Butler & Richard Murray, Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a "Rainbow Coalition" Claim the Protection of the Voting Rights Act?, 21 Pac. L.J. 619, 642 (1990)("The voluminous legislative history surrounding the [1982] amendment to Section 2 contains no reference to a 'coalition' suit."); Rick G. Strange, Application of Voting Rights Act to Communities Containing Two or More Minority Groups--When is the Whole Greater Than the Sum of the Parts?, 20 Tex. Tech L.Rev. 95, 111-12 & n.99 (1989) ("Congress provided no answer in either the Act's wording or in accompanying committee reports," concerning coalition suits).
 
 
 28
 Faced with the absence of legislative history to support their position, plaintiffs and the NAACP first argue that we should be swayed by the unanimous authority to the contrary. See International Soc'y for Krishna Consciousness, Inc. v. Lee, 925 F.2d 576, 580 (2d Cir.1991)(where there is considerable weight of unanimous authority, creation of circuit conflict "must be baned [sic] on an abiding conviction that the view of several circuits is unreasonable, lest the Supreme Court's ability to resolve conflicts among the circuits be impaired by the sheer number of circuit conflicts"), aff'd in part, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In the leading case on the subject, Campos, supra,[9] African-American and Hispanic-American voters of Baytown, Texas, challenged the city's at-large system of electing councilmen. Because neither the African Americans nor the Hispanic Americans by themselves were numerous enough to constitute a majority in a single-member district, the district court allowed the two groups to combine and held that a majority-minority district should be created. Campos, 840 F.2d at 1242. The Fifth Circuit affirmed the use of coalitions, stating:
 
 
 29
 There is nothing in the law that prevents plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics. Section 1973(a) protects the right to vote of both racial and language minorities. Congress itself recognized "that voting discrimination against citizens of language minorities is pervasive and national in scope," and similar discrimination against Blacks is well documented. If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the Gingles threshold as potentially disadvantaged voters.
 
 
 30
 Id. at 1244 (citations omitted). We, however, share the concerns articulated by Judge Higginbotham in his dissent from the denial of rehearing in Campos:
 
 
 31
 This is a disturbing reading of a uniquely important statute, and one with the potential to affect the very structure of every school district, county, and city government in most states of this nation. It is puzzling then that the panel opinion cites no authority and offers no reasoning to support its fiat.
 
 
 32
 To the contrary, the pronouncement, despite its Olympian ring, is no more than the result of asking the wrong question. The question is not whether Congress in the Voting Rights Act intended to prohibit such coalitions; instead, the proper question is whether Congress intended to protect those coalitions. A statutory claim cannot find its support in the absence of prohibitions.... Thus, even if the panel had attempted to support its fiat with inferences of intent gleaned from the statute, it would not have been proper to do so.
 
 
 33
 Campos Reh'g, 849 F.2d at 944-45 (Higginbotham, J., dissenting) (footnote omitted).
 
 
 34
 As noted, only the Fifth Circuit has squarely addressed the issue presented to this en banc court. The remaining courts have merely assumed coalitions are proper without further reflection. Although we do not take lightly disagreement with the views of our sister circuits, we are not constrained to follow them if, in our opinion, they are based upon an incomplete or incorrect analysis. See Atchison, Topeka & Santa Fe Ry. v. Pena, 44 F.3d 437, 443 (7th Cir.1994)("while we carefully consider the opinions of our sister circuits, we certainly do not defer to them ... [o]ur duty is to independently decide our own cases, which sometimes results in disagreements with decisions of the other circuits")(internal citation omitted), cert. granted, --- U.S. ----, 115 S.Ct. 2575, 132 L.Ed.2d 826 (1995). Given the settled principles of statutory interpretation, which none of the aforementioned courts acknowledged, let alone applied, and § 2's clear text, we decline plaintiffs' invitation to follow suit.
 
 C. Expansive Trend
 
 35
 Taking another tack, plaintiffs and the NAACP next argue that an expansive interpretation of the Act is warranted by its broad remedial purposes. They attempt to analogize the present case to Chisom v. Roemer, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), in which the Supreme Court held that the Voting Rights Act applied to the election of judges, despite Congress' use of the word "representatives" in the 1982 amendments to the Voting Rights Act. See 42 U.S.C. § 1973(b). In so holding, the Court observed that the Voting Rights Act had been enacted with a broad remedial purpose and, therefore, it "should be interpreted in a manner that provides 'the broadest possible scope' in combatting racial discrimination." Chisom, 501 U.S. at 403, 111 S.Ct. at 2368 (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 832-33, 22 L.Ed.2d 1 (1969)). The Court rejected the idea that "representatives" somehow excludes judges "because we are convinced that if Congress had such an intent, Congress would have made it explicit in the statute, or at least ... mentioned it at some point in the unusually extensive legislative history...." Id. at 396, 111 S.Ct. at 2364-65. Relying on Chisom, plaintiffs and the NAACP argue that under a broad construction, coalition suits should be permitted because Congress did not specifically exclude them.
 
 
 36
 Plaintiffs' reliance on Chisom is misplaced. In Chisom, it was "undisputed that § 2 applied to judicial elections prior to the 1982 Amendment." Chisom, 501 U.S. at 390, 111 S.Ct. at 2361-62. The crux of that decision was that Congress, having specifically covered judicial elections in prior versions of the Act, should not be considered to have withdrawn that protection absent some strong indication in either the text or the legislative history. Chisom, 501 U.S. at 395-96, 111 S.Ct. at 2364-65. In other words, for Congress to withdraw, "without comment, an important category of elections from [§ 2] ... [would be] ... anomalous." Id. at 404, 111 S.Ct. at 2368-69.
 
 
 37
 Unlike Chisom, here it is undisputed that the Voting Rights Act has never permitted coalition suits by its terms, and that no mention is made of them anywhere in the legislative history. Thus, we do not reach questions regarding the scope of protections provided by the Act, because we are detained by a more fundamental query: Did Congress intend to protect coalitions in the first place? If minority coalitions are not a protected class, the remedial nature of the Voting Rights Act is irrelevant. See Clements, 999 F.2d at 896 (Jones, J., concurring)("[s]tating that certain types of elections are within Section 2 is a definitional exercise ... [b]ut it is a remedial exercise to decide whether to apply the results test to a minority coalition united not by race or language but only by their desire to advance a particular agenda").
 
 
 38
 In a similar vein, plaintiffs and the NAACP contend that, given Congress' expressed intention to expand § 2 protection in the 1975 and 1982 amendments, not allowing minority coalition claims would be wholly inconsistent with the purpose of the Voting Rights Act. The 1965 Act prohibited any practice that abridged the right of any citizen to vote "on account of race or color." Chisom, 501 U.S. at 392, 111 S.Ct. at 2362-63 (citing 79 Stat. 437). It offered legislative protection to African-American voters only. Angelo N. Ancheta & Kathryn K. Imahara, Multi-Ethnic Voting Rights: Redefining Vote Dilution in Communities of Color, 27 U.S.F. L.Rev. 815, 815 & n. 2 (1993)(Voting Rights Act was originally enacted as protective legislation for disenfranchised African Americans in the Deep South)(citing S.Rep. No. 417, 97th Cong., 2d Sess. 4-7 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 181-84); see also H.R.Rep. No. 439, 89th Cong., 1st Sess. 23 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2440. In 1975, Congress expanded the original prohibition against discrimination " 'on account of race or color' " to include " 'race or color, or in contravention of the guarantees set forth in section 4(f)(2)' of the Act." Chisom, 501 U.S. at 392, 111 S.Ct. at 2362 (citing 89 Stat. 402). The new subsection (f)(b)(2) brought within the statute's purview members of "a language minority group," see id. at 393 n. 18, 111 S.Ct. at 2363 n. 18 (citing 89 Stat. 401), then identified as those of Hispanic origin, American Indians, Asian Americans and Alaskan natives. 42 U.S.C. § 1973b(f)(1); see S.Rep. No. 295, 94th Cong., 1st Sess. 8 (1975), reprinted in 1975 U.S.C.C.A.N. 774, 790. The 1982 amendments "further expanded the protection afforded by § 2," id. at 392, 111 S.Ct. at 2362, by abrogating City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (holding that "vote dilution" claims were actionable only if challenged practice was product of purposeful discrimination).
 
 
 39
 It is certainly true that the 1975 and 1982 amendments reflect that Congress expanded the Act to cover an additional protected class (i.e., language minorities) and that it reduced the burden on minority plaintiffs by reversing the rule of Bolden in the 1982 amendment. (See supra, pp. 12-13 note 8.) The amendments do not, however, reflect a broad and boundless "trend" to expand the Act to protect classes not described in the Act, or to protect combinations of classes not described in the Act, including coalition minorities. "That each of these groups [included in the 1975 amendments] was separately identified indicates that Congress considered members of each group and the group itself to possess homogeneous characteristics. By negative inference, Congress did not envision that each defined group might overlap with any of the others or with blacks." Clements, 999 F.2d at 894 (Jones, J., concurring)(citing Hunter, The 1975 Voting Rights Act and Language Minorities, 25 Cath. U.L.Rev. 250, 254-57 (1986); Butler & Murray, supra, 21 Pac. L.J. at 624-25).
 
 
 40
 This argument further overlooks the fact that the 1982 amendments were heavily contested, and ultimately were passed only because of the inclusion of the proviso in 42 U.S.C. § 1973(b) which warns that the Act should not be interpreted to establish a right to proportional representation. See McGhee v. Granville County, 860 F.2d 110, 117 (4th Cir.1988)(proscription is very significant part of § 2 since passage of that section turned on "the addition to § 2(b) of the 'Dole Compromise' proviso, which specifically disclaimed any legislative intent to establish any 'right' of proportional representation"); LULAC, 812 F.2d at 1503 (Higginbotham, J., dissenting)(proviso in 1982 amendment was political compromise). See generally Thomas M. Boyd & Stephen J. Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L.Rev. 1347 (1983). This compromise reflects a recognition by many in Congress that the Voting Rights Act represents a significant intrusion into the rights of states and their subdivisions to manage local governance as they will, as well as a significant invitation to undermine the one-person-one-vote principle.[10] Although the aims of the Voting Rights Act are laudable, this delicate balance provides additional evidence that the words of the 1982 amendment were chosen with particular care and courts should be cautious in construing them.
 
 
 41
 Plaintiffs' and the NAACP's argument confuses what Congress has done with what, in their view, Congress should have done. It is not, however, for this court to accomplish by construction what Congress has failed to do by legislation. United States v. Rodgers, 466 U.S. 475, 484, 104 S.Ct. 1942, 1948, 80 L.Ed.2d 492 (1984)("Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress."). Nor is this court permitted to "rewrite laws so that they may address more precisely the particular problems Congress had in mind." Block v. Meese, 793 F.2d 1303, 1310 (D.C.Cir.), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). Instead, we must apply the law as Congress has written it. Where the plain language of the statute resolves the question before us, our work is done. As Judge Higginbotham stated, "[p]laying with the structure of local government in an effort to channel political factions is a heady game; we should insist that Congress speak plainly when it would do so." Campos Reh'g, 849 F.2d at 945 (Higginbotham, J., dissenting).
 
 D. Policy Concerns
 
 42
 Policy considerations underscore the conclusion that Congress did not authorize coalition lawsuits under the Voting Rights Act. First, the Voting Rights Act is premised upon congressional "findings" that each of the protected minorities is, or has been, the subject of pervasive discrimination and exclusion from the electoral process. Thus, many minorities in society, e.g., Eastern European immigrants or minorities from the Indian subcontinent, are not protected under the Act. The remedies of the Act only extend to members of a minority specifically protected by Congress. Everyone else must proceed under the more difficult, "one person, one vote," constitutional test and its required element of intentional discrimination.
 
 
 43
 A coalition of protected minorities is a group of citizens about which Congress has not made a specific finding of discrimination, but who nevertheless seek to avoid the more difficult constitutional burden by proceeding under § 2. Simply because Congress has found that African Americans have been discriminated against and because Congress has made the same finding regarding Hispanic Americans, there is no basis for presuming such a finding regarding a group consisting of a mixture of both minorities. Campos Reh'g, 849 F.2d at 945 (Higginbotham, J., dissenting)("Congress recognized that language and racial minorities share many disabilities ... [t]o assume, however, that a group composed of both minorities is itself a protected minority is an unwarranted extension of congressional intent"). This is even more true when the findings were made a decade apart and the bases for the two findings are different (i.e., Congress found that African Americans had been disadvantaged specifically by reason of race, while Hispanic Americans had been disadvantaged by reason of language and education). See 42 U.S.C. § 1973b(f)(1); Butler & Murray, supra, 21 Pac. L.J. at 642-45.
 
 
 44
 Second, as Judge Higginbotham pointed out, a coalition theory could just as easily be advanced as a defense in Voting Rights Act cases, a position that courts would be logically bound to accept if plaintiff coalitions were allowed, yet a position at odds with congressional purpose. Campos Reh'g, 849 F.2d at 946 (Higginbotham, J., dissenting). The possibility of defendants drawing district lines so as to "pack" districts with African Americans and Hispanic Americans, thereby submerging the distinct interests of the two groups, casts further doubt on the majority's conclusion that Congress intended to protect coalitions of minorities. Id.; see also Clements, 999 F.2d at 896 (Jones, J., concurring).
 
 
 45
 Not only would acceptance of the coalition theory give an additional tool to legislators bent on furthering an invidious intent, it would also serve to frustrate those who, in good faith, seek to draw district lines according to the Voting Rights Act's nebulous requirements. If district lines are drawn pursuant to a plan to enhance the political impact of minorities separately, the plan faces potential challenge by a coalition of minorities claiming that greater influence could have been achieved had the minorities been "lumped" together. If, on the other hand, the lines are drawn to accommodate all minorities together, the plan faces potential challenge by an individual minority group on the ground that its influence could have been enhanced had it been treated separately. In both situations, courts and legislatures would be forced to "choose" between protected groups when drawing district lines. For this court to give the states, under the Voting Rights Act, a puzzle which is difficult to solve is one thing. To give the states, under the guise of "construction," a puzzle which is impossible to solve is quite another. Yet an impossible puzzle is precisely the result urged by plaintiffs.
 
 
 46
 Third, Congress' adoption of the pre- Bolden test limits violations of the Act to cases in which a minority has been prevented from electing its own representative. Chisom, 501 U.S. at 396-98, 111 S.Ct. at 2364-66 (inability to elect is necessary, though not sufficient, to prove a violation of 42 U.S.C. § 1973). As construed in Gingles, the test enacted by Congress in the 1982 Voting Rights Act amendments requires a showing that the minority is sufficiently numerous and geographically compact to constitute a majority in a single-member district. Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67. This necessarily recognizes that, in some cases, a minority will not be numerous enough to prove a violation of the Voting Rights Act because it fails to "constitute a majority in a single member district." Clements, 999 F.2d at 895 (Jones, J., concurring) (citing Gingles, 478 U.S. at 50 & n. 17, 106 S.Ct. at 2766 & n. 17). Permitting coalition suits effectively eliminates this obstacle, id. at 896, or, at the very least, limits it to cases in which the total of all the protected minorities is less than a majority in any one district.
 
 
 47
 Finally, and most persuasively, when members of various protected minorities "join forces," they do so for the same reason that any two groups coalesce, i.e., to further their mutual political goals. Thus, an African-American/Hispanic-American coalition might elect an African-American representative, or a Hispanic-American one, or some other person, depending upon whom the members of the coalition believe will best protect their shared interests. Permitting such political coalitions the advantage of Voting Rights Act protection, however, risks wrenching the Act from its ideological and constitutional foundations, as well as "dilut[ing] its effectiveness as a measure of the causal relationship among statutory disability, election structures or processes, and election outcomes." Campos Reh'g, 849 F.2d at 945 (Higginbotham, J., dissenting). Judge Higginbotham explained in his dissent from the denial of rehearing in Campos that:
 
 
 48
 A group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition.... I explained [in LULAC ] that:
 
 
 49
 The purpose of the Act is to redress racial or ethnic discrimination which manifests itself in voting patterns or electoral structures. The tie to race or national origin in Justice Brennan's opinion in Gingles is the raw correspondence in votes and outcome. Its three step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting. If a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation, making the group almost indistinguishable from political minorities as opposed to racial minorities. At the least, concluding that a political group lacking the cementing and predictive force of common race or national origin is nonetheless politically cohesive under Gingles is a difficult undertaking with significant risks. The risks include the reality that diluting the requirement of cohesion expands the mission of the Act beyond the treatment of present-day manifestations of chronic bigotry to a more general device for accommodating majority government and plural constituents--thereby revealing a distrust of the ability of our republican government to do so.
 
 
 50
 Campos Reh'g, 849 F.2d at 945 (Higginbotham, J., dissenting)(quoting LULAC, 812 F.2d at 1504 (Higginbotham, J., dissenting)). See also Clements, 999 F.2d at 894 (Jones, J., concurring)(endorsing Judge Higginbotham's view and noting that "crucial problem inherent in the minority coalition theory ... is that it transforms the Voting Rights Act from a statute that levels the playing field for all races to one that forcibly advances contrived interest-group coalitions or racial or ethnic minorities"). See generally Strange, supra, 20 Tex.Tech.L.Rev. at 125 ("If we accept the notion that any group of individuals who share [certain values and socioeconomic factors and having the ability to form coalitions] are entitled to a certain degree of electoral success, then we are in effect criticizing our republican form of government, in which political minorities often fail to attain a level of success consistent with their numbers."); Butler & Murray, supra, 21 Pac. L.J. at 648-49 ("A group that is too small to be expected to win a seat, were it purely a political group, cannot legitimately have heightened expectations because the basis for the group's existence is tied to the race of its members.").
 
 
 51
 Groups whose ideas or candidates do not obtain a majority of votes lose. LULAC, 812 F.2d at 1507 (Higginbotham, J., dissenting)("the essence of our republican arrangement is that voting minorities lose"). That is not an unfortunate by-product of democracy, but is rather the purpose of democracy. The Equal Protection Clause, the Fifteenth Amendment and the Voting Rights Act are aimed only at ensuring equal political opportunity: that every person's chance to form a majority is the same, regardless of race or ethnic origin. See LULAC, 812 F.2d at 1504 (Higginbotham, J., dissenting)(purpose of Act is to provide racial and ethnic minorities with vote they would have had absent discrimination). Coalition suits provide minority groups with a political advantage not recognized by our form of government, and not authorized by the constitutional and statutory underpinnings of that structure.V. CONCLUSION
 
 
 52
 Passage of the Voting Rights Act heightened federal judicial involvement in apportionment. Miller v. Johnson, --- U.S. ----, ----, 115 S.Ct. 2475, 2501, 132 L.Ed.2d 762 (1995)(Ginsburg, J., dissenting). The fact remains, however, that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body," Chapman v. Meier, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975), as allocated by the Constitution, Miller, --- U.S. at ----, 115 S.Ct. at 2500 (Ginsburg, J., dissenting)(citing U.S. Const., art. I, § 2); Growe, 507 U.S. at 34, 113 S.Ct. at 1081), and federal judicial review represents a "serious intrusion" on that function. Id. at ----, 115 S.Ct. at 2487. Plaintiffs' and the NAACP's "broad" construction rationale masks their addition to the statute of a fundamentally different kind of protection never contemplated by Congress, and one which risks running afoul of the express prohibition against proportional representation in § 2. A "broad" construction, the Supreme Court's language makes clear, should only be employed to give effect to Congress' remedial purpose, not our own. The language of the Voting Rights Act does not support a conclusion that coalition suits are part of Congress' remedial purpose and, as previously discussed, there are compelling reasons to believe that they are not.
 
 
 53
 For these reasons, we REVERSE the district court's decision and REMAND for further proceedings not inconsistent with this opinion.
 
 
 54
 KEITH, Circuit Judge, dissenting.
 
 
 55
 Today, in its zeal to create a circuit split, the majority holds that minority groups cannot collectively file a complaint seeking protection from vote dilution under Section 2 of the Voting Rights Act. Specifically, the majority holds that a group of persons protected by the Voting Rights Act, able to meet each of the three factors set out in Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 2766-67, 92 L.Ed.2d 25 (1986), and able to establish that the "totality of circumstances" demonstrates these persons have less opportunity than others to participate in the political process, may not bring a claim under the Voting Rights Act if the group is comprised of different races. Because the majority misconstrues or ignores the history of the Voting Rights Act, principles of statutory construction and all of the federal case law on the subject and because the majority makes constitutionally impermissible distinctions on the basis of race, I DISSENT.
 
 
 56
 I. Statutory Language and Legislative History
 
 A. Statutory Language
 
 57
 When interpreting a statute, the court must first examine the statute's language. See Gwaltney v. Chesapeake Bay Foundation, 484 U.S. 49, 56, 108 S.Ct. 376, 380-81, 98 L.Ed.2d 306 (1987); see also Anness v. United Steelworkers of America, 707 F.2d 917, 920 (6th Cir.1983). Specifically, the court "must interpret the statute as a whole, making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous." Greenpeace, Inc. v. Waste Technologies Indus., 9 F.3d 1174, 1179 (6th Cir.1993) (citing Lake Cumberland Trust, Inc. v. U.S. E.P.A., 954 F.2d 1218, 1222 (6th Cir.1992) (citations omitted)).
 
 
 58
 Section 2 of the Voting Rights Act provides:
 
 
 59
 Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation
 
 
 60
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 61
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 62
 42 U.S.C. § 1973 (1994).
 
 
 63
 Congress' intended limitations on the phrase "protected class," when examined in the context of the entire statute, are unclear. Clearly, Section 2 protects both African-Americans, who have been discriminated against on the basis of race and color, and Hispanic-Americans, who have been discriminated against as language minorities. See 42 U.S.C. § 1973(a) and (b)(f)(2). While any one of the listed groups qualifies as a "protected class," on its face, the Voting Rights Act does not indicate whether a coalition of African-Americans and Hispanic-Americans may constitute a single "class of citizens protected by [the Voting Rights Act whose] members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973(b) (emphasis added). The ambiguity of the phrase a "class of citizens," requires a look at legislative history for enlightenment.
 
 B. Legislative History and Purpose
 
 64
 Where the language of a statute is ambiguous, this Court reviews the legislative history, see United States v. Barry, 888 F.2d 1092, 1093 (6th Cir.1989), because the "cardinal canon of statutory construction [is] that statutes should be interpreted harmoniously with their dominant legislative purpose." Id. at 1096 (citing Spilker v. Shayne Labs., Inc., 520 F.2d 523, 525 (9th Cir.1975)).
 
 
 65
 Before the enactment of the Voting Rights Act in 1965, in many parts of the country, systematic, government sanctioned discrimination insured the monopolization of American democracy by a predominantly white electorate. Consequently, our governing bodies, preoccupied with the concerns of their white constituencies, ignored the needs and interests of a large number of Americans. The Voting Rights Act expanded democracy to include groups previously excluded from the electorate--namely, African-Americans, and later, Hispanic-Americans.
 
 1. The Original Act
 
 66
 In 1965, Congress passed the Voting Rights Act to more fully implement the Fifteenth Amendment.[1] H.R. Rep. No. 439, 89th Cong., 1st Sess. 23 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2439. Originally, Section 2 essentially consisted only of subsection (a), the first part of today's amended Section 2. Notably, Section 2 protection originally did not include language minorities.[2] Congress explicitly intended to redress "the systematic exclusion of Negroes from the polls that characterizes certain regions of this Nation." H.R.Rep. No. 439, 89th Cong., 1st Sess. 23 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2440. Further, "[t]he Act was aimed at measures that dilute the voting strength of groups because of their race, not their numerical inferiority." Salas v. Southwest Texas Jr. College Dist., 964 F.2d 1542, 1548 (5th Cir.1992).
 
 
 67
 2. 1975 Amendments Include Language Minorities
 
 
 68
 In 1975, Congress broadened the Act to protect language minorities. S.Rep. No. 295, 94th Cong., 1st Sess. 8 (1975), reprinted in 1975 U.S.C.C.A.N. 774. Language minority citizens are "racial minorities whose primary language is other than English," id. at 789, and include Hispanic-Americans, Asian-Americans, American Indians and Alaska Natives. Id. at 790. Congress extended the Act by replacing "race or color" with "race or color, or in contravention of the guarantees set forth in section 1973b(f)(2)" of the Act.[3] Chisom v. Roemer, 501 U.S. 380, 392, 111 S.Ct. 2354, 2362, 115 L.Ed.2d 348 (1991).
 
 
 69
 Congress recognized that the discrimination confronting citizens from non-English speaking environments was similar to the discrimination African-Americans faced. Congress stated that:
 
 
 70
 Language minority citizens, like blacks throughout the South, must overcome the effects of discrimination as well as efforts to minimize the impact of their political participation. The State of Texas, for example, has a substantial minority population, comprised primarily of Mexican Americans and blacks. Evidence before the Subcommittee documented that Texas also has a long history of discriminating against members of both minority groups.
 
 
 71
 S.Rep. No. 295 at 25, reprinted in 1975 U.S.C.C.A.N. at 791. Congress noted that many of the same barriers preventing African-Americans from full political participation existed for Hispanic-Americans, such as "invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others." Salas, 964 F.2d at 1549 n. 19 (citing S.Rep. No. 295 at 30, reprinted in 1975 U.S.C.C.A.N. at 796) (quoting Graves v. Barnes, 343 F.Supp. 704, 728 (W.D.Tex.1972), aff'd in part and rev'd in part, White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)). Congress also recognized the "pattern of racial discrimination that has stunted the electoral and economic participation of the black and brown communities." Id.
 
 
 72
 In its discussion of the history of discrimination and the need for expanded protection in the 1975 amendments, the Senate cited at least one case in which African-Americans and Hispanics brought a joint claim under the voting rights act. See Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (finding Black and Puerto Rican voters failed to prove New York legislature drew district concentrating Black and Puerto Rican voters in one of four districts on racial lines), reh'g denied, 376 U.S. 959, 84 S.Ct. 964, 11 L.Ed.2d 977 (1964). If Congress was thus aware that more than one minority group could be considered to constitute one plaintiff class in determining the availability of Voting Rights Act protection, certainly the absence of an explicit prohibition of minority coalition claims compels a construction of Section 2 which allows them.
 
 3. 1982 Amendments
 
 73
 In 1982, Congress clarified the standards necessary to prove a violation under Section 2. S.Rep. No. 97-417, 97th Cong., 2d Sess. 4 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 178. Specifically, in response to the Supreme Court's holding in Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), that Section 2 required evidence of discriminatory intent to establish a Section 2 violation, Congress adopted a results test, Chisom v. Roemer, 501 U.S. at 392-93, 111 S.Ct. at 2362-63, while maintaining the original goal of eliminating voting discrimination on the basis of race or ethnicity. S.Rep. No. 97-417, 97th Cong., 2d Sess. 4 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 181. Congress replaced "(n)o voting qualification ... shall be imposed ... to deny or abridge the right ... to vote" with "(n)o voting qualification ... shall be imposed ... which results in a denial or abridgement of the right ... to vote." (emphasis added). In adopting the results test, Congress also added a new subsection (b) requiring an inquiry into the "totality of the circumstances" to determine whether members of a protected class of citizens have less opportunity than others to participate in the political process. In expanding the Act, the Senate Judiciary Committee stated:
 
 
 74
 [I]f an electoral system operates today to exclude blacks or Hispanics from a fair chance to participate, then the matter of what motives were in an official's mind 100 years ago is of the most limited relevance. The standard under the Committee amendment is whether minorities have equal access to the process of electing their representatives.
 
 
 75
 S.Rep. No. 97-417, 97th Cong., 2d Sess. 4, 36 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 214 (emphasis added).
 
 
 76
 In Thornburg v. Gingles, the Supreme Court interpreted the 1982 amendments and clarified the requirements of a Section 2 claim. 478 U.S. 30, 50-51, 106 S.Ct. 2752, 2766-67, 92 L.Ed.2d 25 (1986). Specifically, in Gingles, the Court set out three prerequisites which must be met before employing the "totality of circumstances" analysis. Under Gingles, a plaintiff class must prove:
 
 
 77
 (1) the class is sufficiently large and geographically compact to comprise a majority in a single-member district;
 
 
 78
 (2) political cohesiveness;
 
 
 79
 (3) the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances ... usually to defeat the minority's preferred candidate.
 
 
 80
 Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67.
 
 
 81
 II. Courts and Attorney General Allow Minority Coalitions
 
 
 82
 All courts addressing minority coalition claims under Section 2 have assumed they are permissible where the Gingles prerequisites are satisfied.[4] Further, the Attorney General supports minority coalition claims. Specifically, the Fifth and the Eleventh Circuits have concluded that two separate minority groups who demonstrate politically cohesive behavior may constitute a single minority group for Section 2 protection. See Campos v. City of Baytown, Texas, 840 F.2d 1240, 1244 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); Concerned Citizens v. Hardee County Bd., 906 F.2d 524, 526 (11th Cir.1990); see also Bridgeport Coalition v. City of Bridgeport, 26 F.3d 271 (2d Cir.), vacated and remanded on other grounds, --- U.S. ----, 115 S.Ct. 35, 129 L.Ed.2d 931 (1994); League of United Latin Am. Citizens v. Midland Indep. Sch. Dist., 648 F.Supp. 596 (W.D.Tex.1986), aff'd, 829 F.2d 546 (5th Cir.1987). In Campos, the Fifth Circuit noted:
 
 
 83
 There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics. Section 1973(a) protects the right to vote of both racial and language minorities. See 42 U.S.C. §§ 1973(a), 1973b(f)(2). Congress itself recognized "that voting discrimination against citizens of language minorities is pervasive and national in scope," 42 U.S.C. § 1973b(f)(1), and similar discrimination against Blacks is well documented. If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the Gingles threshold as potentially disadvantaged voters.
 
 
 84
 Campos, 840 F.2d at 1244. Furthermore, although multiple ethnic groups in a specific district have failed factually to meet the Gingles prerequisites,[5] no court has excluded minority coalition claims from Section 2 coverage.
 
 
 85
 Additionally, the Attorney General, the officer entrusted to enforce the Act, has argued that Section 2 applies to minority coalition claims. "[I]n light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress," the Attorney General's interpretation of the Voting Rights Act provides compelling evidence of the original congressional interpretation of the Act. See United States v. Sheffield Bd. of Comm'rs, 435 U.S. 110, 131, 98 S.Ct. 965, 979, 55 L.Ed.2d 148 (1978); see also Presley v. Etowah County Comm'n, 502 U.S. 491, 508, 112 S.Ct. 820, 831, 117 L.Ed.2d 51 (1992). Since the enactment of the Voting Rights Act, the Attorney General has demanded an expansive construction of the Act. Chisom v. Edwards, 839 F.2d 1056, 1064 (5th Cir.), cert. denied, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). During congressional hearings prior to the 1965 passage of the Act, the Attorney General stated that the Act would cover "every election in which registered voters are permitted to vote." Voting Rights: Hearing Before Subcomm. No. 5 of the House Judiciary Comm., 89th Cong., 1st Sess. 21 (1965).
 
 
 86
 Continuing the trend of expansive interpretation to further the Act's remedial purpose, the Attorney General has advocated the use of minority coalition claims:
 
 
 87
 [Section 2] protects both Hispanic and black voters against election systems that dilute their voting strength.... As this Court explained in Gingles, the determination of whether an election system dilutes minority voting strength "depends upon a searching practical evaluation of the past and present reality ... and on a functional view of the political process." ... This is necessarily a "flexible, fact-intensive inquiry" ... Accordingly, if the political reality is that Hispanics and blacks view themselves to a significant degree as a single unit, and are viewed by whites as disfavored "minorities", then it is sensible to treat them as one group under the Voting Rights Act. Thus, in our view, where Hispanics and blacks vote as a single cohesive bloc, and whites vote as a bloc to defeat their preferred candidates, Section 2 permits Hispanics and blacks to assert a vote dilution claim as a single combined minority.
 
 
 88
 Brief for the NAACP Legal Defense Fund as Amicus Curiae at 35-36 (quoting Brief for the Amicus Curiae United States Opposing Certiorari at 8-9, Baytown v. Campos, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989)(No. 88-606)). Thus, the Attorney General's construction of the Act supports the finding that Section 2 permits minority coalition claims.
 
 
 89
 The Supreme Court has not spoken directly on the viability of minority coalition claims. In Growe v. Emison, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), the Supreme Court assumed (without deciding) that coalition claims were viable under the Voting Rights Act. Although the Court, after an analysis of the claim under the factors enunciated in Gingles, held that the specific minority coalition involved did not meet those factors, id. at 37-41, 113 S.Ct. at 1083-85, the Court did not rule out the viability of a coalition claim which meets the Gingles factors and the totality of the circumstances test. In the instant case, the majority would deny the plaintiffs even the chance to present evidence of size, geographical compactness, political cohesiveness and majority bloc voting before determining that they, by virtue of their multiple races, are not intended to have Voting Rights Act protection.
 
 III. Analysis
 
 90
 A. Statutory Language and Legislative History Permit Coalitions
 
 
 91
 The majority holds that because the Voting Rights Act does not expressly address minority coalition claims, Congress clearly did not intend to provide Section 2 protection for such claims. I disagree.
 
 
 92
 Section 2, subsection (a) provides protection to persons whose rights are denied or abridged on the basis of race, color or language. 42 U.S.C. § 1973. Section 2, subsection (b) provides that protection shall be provided when those persons establish unequal access to participation in the political process. Id. On the face of Section 2 it is irrelevant that individuals protected under the Voting Rights Act encompass different ethnicities. See id. Rather, such individuals comprising the protected class must only meet the tests set out in the statute as interpreted by the Supreme Court. See Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67.
 
 
 93
 The majority ignores this reading of the statute to find that minority coalition claims are prohibited although there is nothing in the statute which expressly prohibits them. Given the differing conclusions of the majority and those who dissent from its holding, the phrase, "class of citizens," is certainly ambiguous with regard to Congress' intent to allow or disallow minority coalition claims. The majority failed to comply with the mandates of statutory construction by examining the legislative history and relevant case law for guidance on the interpretation of Section 2 of the Voting Rights Act.
 
 
 94
 The Voting Rights Act should be "interpreted ... in a manner which affords it 'the broadest possible scope' in combatting racial discrimination." Chisom v. Edwards, 839 F.2d at 1059 (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 565, 89 S.Ct. 817, 831-32, 22 L.Ed.2d 1 (1969)). In Chisom v. Roemer, the United States Supreme Court, addressing a question similar to the issue raised here, held Section 2 of the Voting Rights Act applies to state judicial elections. Chisom v. Roemer, 501 U.S. at 404, 111 S.Ct. at 2368-69. Although neither the language of the statute nor the legislative history expressly addressed whether judges constituted "representatives" under Section 2, the Court rejected respondents' argument that Congress' use of the word "representative" denoted legislators and excluded the election of judges from coverage under the Act. Id. at 395-402, 404, 111 S.Ct. at 2364-68, 2368-69. The Court, finding it "difficult to believe that Congress ... [would withdraw], without comment, an important category of elections from [such] protection," determined that the broad term "representatives" included elected judges. Id. at 404, 111 S.Ct. at 2368-69. Our court reached an identical conclusion three years earlier in Mallory v. Eyrich, 839 F.2d 275, 281 (6th Cir.1988).
 
 
 95
 In the present case, as in Chisom v. Roemer and Mallory, neither the language of the statute nor the legislative history limits Section 2 protection to cases involving only one historically disadvantaged ethnic group. While the majority points to the singular tense of the word "class " in section (b) as determinative of Congress' intent to ban minority coalition claims, nothing in that word negates the intent of section (a) to provide full voting rights protection to those citizens enumerated therein. Interestingly, the "class" language which the majority uses to restrict the voting rights protection was added in 1982, after language minorities were brought under the Act's protection. It does not make sense that Congress would, through the addition of subsection (b), prevent the listed protected groups from bringing a claim together. This is especially true where Congress has, in the Senate Report, referred to cases in which Blacks and Hispanics constitute one claimant class.
 
 
 96
 Here, the majority finds the absence of language addressing minority coalitions indicates Congress unambiguously did not intend for "protected class" under Section 2 to include minority coalitions. Just as the Court did in Chisom v. Roemer, such a construction of the Voting Rights Act must be rejected because "if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment." Chisom v. Roemer, 501 U.S. at 396, 111 S.Ct. at 2364-65. In the absence of any legislative history or statutory language to the contrary, the only acceptable interpretation of the Act is that classes of minorities from different ethnic backgrounds are protected. See Chisom v. Edwards, 839 F.2d at 1061-62.
 
 
 97
 Additionally, the context of the 1982 amendments supports the conclusion that the broad term "protected class" includes minority coalitions. The majority essentially holds that the phrase "protected class" is a narrowing term intended to divide individuals of protected ethnicities and limit possible claims under the Voting Rights Act. This treatment of "protected class" is inconsistent with the purpose of the 1982 amendments to extend application of the Act. Congress' clear intention to broaden the Voting Rights Act suggests that "protected class" includes any group consisting of individuals protected under the Voting Rights Act which satisfies the Gingles prerequisites. "Any other construction of section 2 would be wholly inconsistent with the plain language of the Act and the express purpose which Congress sought to attain in amending Section 2; that is, to expand the protection of the Act." Chisom v. Edwards, 839 F.2d at 1061. Just as Chisom v. Roemer and Mallory refused to limit "representatives" to legislators, we should refuse to limit "protected class" to a single ethnic group protected under Section 2.
 
 
 98
 B. The Majority Makes Impermissible Distinctions on the Basis of Race
 
 1. Racial Homogeneity Is Not Required
 
 99
 Although no case law supports their position, the majority seizes onto the reasoning from Judge Patrick Higginbotham's dissent in Campos v. City of Baytown, 849 F.2d 943, 945 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989), to hold African-Americans and Hispanic-Americans lack the same "statutory disability," and therefore are no more than a political alliance or coalition. I disagree.
 
 
 100
 The majority opinion mistakenly focuses upon the origins of discrimination plaguing African-Americans and Hispanic-Americans, rather than the results of such discrimination. Past motives behind discriminatory treatment are of limited relevance. S.Rep. No. 97-417, 97th Cong., 2d Sess. 4, 36 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 214. The question is not how to distinguish between majoritarian society's discriminatory motives regarding African-Americans and Hispanic-Americans. Rather, the proper inquiry is whether, "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." Gingles, 478 U.S. at 44, 106 S.Ct. at 2762-63 (quoting S.Rep. No. 97-417 at 28). The majority's ruling that in all cases voters historically denied access to the political process, protected under the Voting Rights Act, and sharing identical interests must be ethnically classified and segregated from one another denigrates the spirit and the language of the constitution.
 
 
 101
 Racial homogeneity, which divides victimized Americans and conquers any opportunity they have to participate in democracy, is not a requirement under the Voting Rights Act. Although the Voting Rights Act prohibits formation of separate "minority" districts when a protected ethnic group and the white majority vote together and have common interests, the majority mandates segregation of two protected minority groups who vote together, have common interests and have been denied access. Where all elements of the Gingles prerequisites are satisfied, I would refuse to impair the right to an effective voice in our society by diluting minority voting influence through mere racial classification.
 
 
 102
 2. The Majority's Imposition of Racial Classifications is
 
 
 103
 Constitutionally Impermissible.
 
 
 104
 The majority, today, segregates the Black and Hispanic beneficiaries of Voting Rights Act protection solely on the basis of race. According to the current law of this land, "[l]aws classifying citizens on the basis of race cannot be upheld unless they are narrowly tailored to achieving a compelling state interest." Miller v. Johnson, --- U.S. ----, ----, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762 (1995); see e.g., Adarand Constructors, Inc. v. Pena, --- U.S. ----, ----, 115 S.Ct. 2097, 2112, 132 L.Ed.2d 158 (1995); Richmond v. J.A. Croson Co., 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion). The Supreme Court reemphasized this standard in Miller:
 
 
 105
 "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.... This perception of racial and ethnic distinctions is rooted in our Nation's constitutional and demographic history." Regents of Univ. of California v. Bakke, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.). This rule obtains with equal force regardless of "the race of those burdened or benefited by a particular classification."
 
 
 106
 Miller, --- U.S. at ----, 115 S.Ct. at 2482 (quoting Croson, 488 U.S. at 494, 109 S.Ct. at 722 (plurality opinion)).[6] Persons whose voting rights are abridged or denied because of their race, color, or language have been singled out by Congress in Section 2, subsection (a) of the Voting Rights Act as requiring protection based on the history of discrimination lodged against non-white persons in the voting arena. What compelling state interest requires the segregation of Voting Rights Act claimants when they are of differing races? I can think of none.
 
 
 107
 Although the majority concedes the Voting Rights Act is remedial legislation, citing Judge Edith H. Jones' concurrence in League of Latin Am. Citizens v. Clements, 999 F.2d 831, 894 (5th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994), they cast the protection the Act affords victims of discrimination and its remedies for discriminatory limitations on the right to vote as giving minorities an unfair advantage over the majority if minority coalitions are protected. This illogical argument ignores the extensive safeguards already in place to ensure the burdens of proof imposed upon Section 2 plaintiffs are consistent and coextensive with the remedial reach of Section 2. Gingles requires minority plaintiffs to demonstrate that a challenged election practice or system denies them an equal opportunity to participate in the political process and elect candidates of their choice on account of race or language minority status. The district court in the instant case stated clearly, "[T]he congressional intent to bar voting discrimination on account of race, color, or national origin mandates application of the statute to a group consisting of various of these protected minorities, if sufficient commonality or cohesion between the groups is demonstrated." Nixon v. Kent County, 790 F.Supp. 738, 743 (W.D.Mich.1992)(emphasis added).
 
 
 108
 The majority submits minority coalitions should not be allowed because political cohesiveness may not be proved. This implies single-minority claims should never fail because every single-minority plaintiff group must necessarily be politically cohesive. The district court wisely recognized the flaw in that logic when it concluded minority coalition claims are subject to no less stringent analysis than Section 2 claims brought by only one minority group:
 
 
 109
 When one minority group claims voting discrimination ... the members' common basis for claiming discriminatory inequality in the electoral process is apparent. When more than one minority group is claiming aggregate discrimination, the common basis is not so obvious. Plaintiffs [therefore] must .... show that "the two groups are indeed 'one' and that the reason for their status as a 'combined' discrete minority is their shared discriminatory treatment at the hands of the majority."
 
 
 110
 Opinion of Dec. 23, 1992 at 4-5 (motion to dismiss), Nixon v. Kent County, 790 F.Supp. 738 (W.D.Mich.1992)(No. 91-792)(quoting Katharine I. Butler and Richard Murray, Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a "Rainbow Coalition" Claim the Protection of the Voting Rights Act? 21 PAC. L.J . 619 (1990)).
 
 
 111
 The majority's position is offensive to the extent it assumes automatic homogeneity of interest within and automatic divergence of interests between racial groups. At the same time, the majority's position offends to the extent it dismisses the significant convergence of interests within and among minority groups. While it is true that all African-Americans do not " 'think alike, share the same political interests, [or] prefer the same candidates at the polls,' " Miller, --- U.S. at ----, 115 S.Ct. at 2486 (quoting Shaw v. Reno, 509 U.S. 630, ----, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993)), African-Americans and other minorities share a place in history that often translates into shared political goals. Judge Leon Higginbotham discussed this phenomenon in his commentary on the Supreme Court's decision in Miller, supra:
 
 
 112
 Because of its lofty, color-blind goals, the court held that a Georgia district, in which African-Americans represented a majority of voters, violated the equal protection clause of the Constitution because the Georgia Legislature had relied on race as a "predominant factor" in drawing the district. The court reasoned that the Legislature had created a political community where none existed before, since the African-Americans in the district did not seem to share any common interests other than their race.
 
 
 113
 This reasoning, we imagine, will come as a shock to most African-Americans. African-Americans have contributed much to this country's cultural heritage. Moreover, when some politicians need to garner the "white" vote, they have no difficulty in portraying African-Americans as a single community from whose pathologies "decent" society needs to be protected. (Remember the Republicans' Willie Horton photos used by President Bush's Campaign?) Finally, if the tumultuous history of blacks in America is not enough to qualify us as a "community," it is difficult to imagine which group could possibly fit that description.
 
 
 114
 A. Leon Higginbotham, Jr.[7] and Aderson Bellegarde Francois, The Supreme Court's Blinders, The Boston Sunday Globe, July 9, 1995, at 63.
 
 
 115
 Certainly, African-Americans and Hispanic-Americans, separately and collectively, have experienced societal discrimination and as a result, will sometimes share similar political interests they wish to advance. The purpose of the Voting Rights Act is to allow these political interests a voice in circumstances where the majority white community blocks, by design or result, the expression of these communities' political voice. At times, the evidence will show that a group of African-Americans is disabled by the shapes and sizes of certain districts from speaking with its politically cohesive voice. At times, the evidence will show that a group of Hispanic-Americans has been silenced by a districting plan that reduces its votes to meaningless acts. At times, the evidence will show that a community, sufficiently large and geographically compact and politically cohesive is prevented from pronouncing its voice in the political arena due to a white majority bloc vote. At times, a minority community will not receive Section 2 protection because it fails to produce evidence sufficient to satisfy the three pronged Gingles test. After today's majority opinion such a community will lay unprotected, whether or not the evidence produced satisfies Gingles, if it is multi-ethnic, diverse and/or integrated. In the instant case, the plaintiffs have been denied their day in court simply because they are of different races.
 
 
 116
 Perhaps what is most disturbing is that the practical effect of the majority's holding requires the adoption of some sort of racial purity test, so that minority group members can be properly identified and kept in their place. If we are to make these distinctions, where will they end? Must a community that would be considered racially both Black and Hispanic be segregated from other Blacks who are not Hispanic? Should the dwindling numbers of Native Americans be further decimated by a parsing of Navaho from Apache? Must Puerto-Ricans and Dominicans in the same neighborhood be separated based on their separate cultural and historical backgrounds? Perhaps we will return to a time of classifying African-Americans as quadroons and octoroons[8] for the purposes of racial classification.
 
 
 117
 If both African-Americans and Hispanic-Americans share a history of discrimination and a current exclusion from the political process, and if the Voting Rights Act was meant to redress and rectify voting schemes that enforce such oppression, it seems the clear and only reasonable interpretation of the Voting Rights Act is one that protects African-Americans and Hispanic-Americans individually and collectively. To put it another way, if the Voting Rights Act was enacted to prevent white voting blocs from silencing African-Americans and if the Voting Rights Act was amended to prevent white voting blocs from rendering meaningless the political participation of Asian-Americans, Native Americans, Hispanic-Americans and Alaska Natives, it is logical to conclude that the Voting Rights Act was intended to prevent white voting blocs from diminishing the voting rights of African-Americans and language minorities at the same time. If the Voting Rights Act will not protect minorities it must protect those who wish to subjugate minorities. Sadly, we return full circle to the original reasons for the Voting Rights Act. Non-white Americans, those generally considered minorities by their fellow white Americans, are today denied the right to free and meaningful political participation if they live next to and with one another. Do we make these distinctions between whites of Italian, German or Yugoslavian descent who constitute a voting bloc? No. That is not the way this country works. Many have been able to blend into the melting pot which is America and claim full entitlement to the fruits and opportunities which make this land great. Some, as the legislative histories demonstrate, are constantly and consistently kept on the outside due to their phenotypic differences.[9] These are our communities of color. We all long for a day when there will be no need for a Voting Rights Act. The existence of the Voting Rights Act confirms our fears that racism is alive and well in the United States of America; that some Americans in various parts of the country continue to prevent minorities from enjoying the full privileges of citizenship based on their race, color and language. Today, the majority further discriminates by compartmentalizing the discriminated against into segregated boxes from which their potential to participate fully in political life is significantly diminished. This holding violates the spirit and letter of the Constitution and reminds us of the reasons for enacting the Voting Rights Act in the first place.
 
 3. Minority Vote Dilution
 
 118
 Finally, the majority further justifies its holding by concluding judicial approval of coalition claims, absent statutory restrictions, could be used to dilute voting strength of minorities. Specifically, the majority, citing Judge Patrick Higginbotham's dissent from denial of rehearing en banc in Campos, 849 F.2d at 946, finds that "a coalition theory could just as easily be advanced as a defense in Voting Rights Act cases" since an apportionment committee could combine two ethnic groups to submerge the interests of one of those groups.
 
 
 119
 Once again, the majority loses sight of the mechanisms in place that govern the Voting Rights Act's effect. The very same standard that a coalition of one or more groups must reach in order to demonstrate entitlement to Section 2 protection precludes attempts to submerge divergent interests. The coalition created must be in all circumstances politically cohesive. Moreover, the judiciary is in no position to legislate a prohibition of minority coalitions when to do so would contravene congressional intent.
 
 IV. Conclusion
 
 120
 I would affirm the district court's conclusion that coalitions of protected minority groups may assert a claim under Section 2 of the Voting Rights Act. Today, the majority goes to great lengths to foster the re-creation and continuance of the very same white majority voting blocs that provided the impetus for the creation of the Voting Rights Act. When one carefully considers voting rights law, its history, its practical application and effects and the majority's terribly flawed logic, it becomes clear that the majority has no other intention than to create a circuit split on this important issue in blind pursuit of its preferred result. However, those who have already obtained their freedom should not set a timetable on another group's freedom. Voting is so precious and so basic to the spirit of our Constitution that to be deprived of that right is tantamount to being deprived of one's liberty.
 
 
 121
 The Supreme Court has made clear that "[a]ny abridgement of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election." Chisom v. Roemer, 501 U.S. at 397, 111 S.Ct. at 2365. In direct violation of the Voting Rights Act, the majority requires a racially homogeneous "class," thus denying the rights of those protected by the Voting Rights Act to participate in the political process on account of their race, color, or minority language status. The majority artificially classifies victims of discrimination based on "statutory disabilities," even though members of a protected class may share identical interests and satisfy the Gingles prerequisites. Such compartmentalization is hauntingly similar to an "enforced separation of the two races." Plessy v. Ferguson, 163 U.S. 537, 551, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (1896). In short, today's decision requiring racial homogeneity within Voting Rights Act claims dilutes minority voting power, multiplies the impact of discriminatory white bloc voting, and impairs the ability of protected minorities to influence the outcome of an election. I am deeply troubled by the majority's deplorable disregard for fundamental fairness. For the sake of racial and language minorities who have been long denied full participation in the political process of this great Nation, I DISSENT.
 
 
 122
 BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.
 
 
 123
 Judge Keith has very ably stated my position in sections I, II and IIIA of his dissent, and I join with him in those parts. I also join Judge Jones' dissent for it speaks so well to our loss of an historic perspective in this most vital issue of the right to vote for a candidate of one's choice.
 
 
 124
 NATHANIEL R. JONES, Circuit Judge, dissenting.
 
 
 125
 I add this word to Judge Daughtrey's dissent expressing appreciation for the historical perspective of the Voting Rights Act, which was provided by Judge Keith. I think that it is particularly significant for this statement to be made at this time in that the nation is reflecting on the centennial of the pernicious decision handed down by the Supreme Court in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).
 
 
 126
 Were I so empowered, I would decree that every Judge, federal and state, be required to read Justice Henry Billings Brown's majority opinion and Justice John Marshall Harlan's dissenting opinion. Our current civil rights remedies cannot be properly understood without a knowledge of how the United States Supreme Court constitutionalized policies and practices that relegated an entire race of people, based on color, to second-class status. See Plessy, 163 U.S. at 540-50, 16 S.Ct. at 1139-43 (holding that Louisiana segregation statute did not violate the Thirteenth and Fourteenth Amendments).
 
 
 127
 One of the principal reasons that our nation is tossing and turning over the issue of race and racial remedies is the separate-but-equal road taken by Justice Brown and his Supreme Court colleagues in 1896. There was a clear alternate road available to them which they refused to take. Had they the courage and foresight of the late Justice Harlan, this nation would be spared the current travail.
 
 
 128
 The road not taken by Justice Brown and the Plessy majority consisted of this plain proposition, eloquently articulated by Justice Harlan:
 
 
 129
 [I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.
 
 
 130
 Plessy, 163 U.S. at 559, 16 S.Ct. at 1146-47.
 
 
 131
 As Judge Keith notes, the Voting Rights Act is one of Congress's significant attempts to provide a remedy that the Fifteenth Amendment authorizes, because of the "road not taken" in 1896.
 
 
 132
 If we cannot effectively enforce this Act, we are once again guilty of what the late Justice Potter Stewart stated in Jones v. Mayer Co.: that the Constitution has "made a promise which the Nation cannot keep." 392 U.S. 409, 443, 88 S.Ct. 2186, 2205, 20 L.Ed.2d 1189 (1968).
 
 
 133
 The issues of this case and the centennial of Plessy affords a timely occasion to be reminded of this history.
 
 
 134
 DAUGHTREY, Circuit Judge, dissenting.
 
 
 135
 I join Judge Keith's dissent and eloquent defense of the laudable goals of the Voting Rights Act, as amended. I write separately, however, to underscore my firm belief and fervent hope that the majority's decision today is guided only by a failure to adhere to the spirit and the letter of that Act and the analysis mandated in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and not by any improper or unjust intent.
 
 
 136
 MOORE, Circuit Judge, dissenting.
 
 
 137
 For the reasons ably explained by Judge Keith in Parts I, II, and IIIA of his dissenting opinion, traditional principles of statutory interpretation require that Section 2 of the Voting Rights Act be interpreted to include within a "protected class" a coalition of groups of persons protected by the Voting Rights Act. Therefore I DISSENT from the majority opinion and join in Parts I, II, and IIIA of Judge Keith's dissenting opinion.
 
 
 
 [1]
 Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). For a discussion of the Gingles test, see section III of this opinion, pp. 1385-86
 
 
 [2]
 The Growe court held that the plaintiffs failed to show vote dilution because they failed to prove "political cohesiveness" of the minority groups, the second of Gingles 's three requirements. Growe v. Emison, 507 U.S. 25, 40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993)
 
 
 [3]
 The following facts are derived from the plaintiffs' first amended complaint and the district court's opinion denying the preliminary injunction. See Nixon v. Kent County, 790 F.Supp. 738 (W.D.Mich.1992). Because we are reviewing the district court's denial of defendants' motion to dismiss, we must assume, as did the district court, that all pleaded facts are true
 
 
 [4]
 "A single-member district system is one in which the political unit, a county, for example, is divided into a number of sections (districts), each one of which elects a single representative." Katharine I. Butler & Richard Murray, Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a "Rainbow Coalition" Claim the Protection of the Voting Rights Act?, 21 Pac. L.J. 619, 625 n.12 (1990)
 
 
 [5]
 The Kent County Apportionment Commission is composed of the county clerk, the county treasurer, the prosecuting attorney, and the chairs of the two major political parties in the county. See Mich. Comp. Laws Ann. § 46.403 (1979)
 
 
 [6]
 42 U.S.C. § 1973b, referenced in § 1973(a), states in relevant part:
 (f)(1) The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices.
 (2) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.
 42 U.S.C. § 1973b(f)(1988).
 
 
 [7]
 In fact, throughout the extensive legislative history of the Act, Congress has only once addressed the aggregation of separately protected groups and then in the negative. See 42 U.S.C. § 1973b(f)(3) (language minorities may not aggregate their numbers for purposes of meeting the threshold numeric requirements for foreign-language ballots of 42 U.S.C. § 1973b)
 
 
 [8]
 Obviously, because "language minorities" were not protected until 1975, "coalition" suits were not possible in early Voting Rights Act litigation. Nor did plaintiffs proceed as coalitions under the Fourteenth Amendment, one person, one vote cases. Not until Congress amended the Voting Rights Act in 1982 by substituting the tests of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) for the "intent" test the Supreme Court had applied in Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), did the concept of coalition suits arise
 
 
 [9]
 In League of United Latin Am. Citizens v. Midland Indep. Sch. Dist., 812 F.2d 1494 (5th Cir.), vacated and rev'd on state law grounds, 829 F.2d 546 (5th Cir.1987)(en banc), which preceded Campos v. City of Baytown, 840 F.2d 1240 (5th Cir.), reh'g denied, 849 F.2d 943 (1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989), the original panel affirmed the district court's treatment of African-American and Hispanic-American voters as a cohesive voting unit despite Judge Higginbotham's protest. The en banc court later vacated the panel decision and affirmed the district court opinion on grounds unrelated to the Voting Rights Act. The entire court for the Fifth Circuit was once again presented with the issue in League of United Latin Am. Citizens v. Clements, 999 F.2d 831, 894 (5th Cir.1993)(en banc). The court once again resolved the dispute on alternative grounds. See Clements, 999 F.2d at 894 & n. 1 (Jones, J., concurring)
 
 
 [10]
 See Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)(holding that Fourteenth Amendment prohibits diluting right of citizens to vote by maintaining malapportioned districts)
 
 
 [1]
 The Fifteenth Amendment provides:
 The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.
 U.S. CONST. amend. XV, § 1.
 
 
 [2]
 The statute read:
 Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites
 No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color....
 42 U.S.C. § 1973 (1965).
 
 
 [3]
 Section 1973b(f)(2) explains:
 (2) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.
 
 
 [4]
 See Badillo v. City of Stockton, 956 F.2d 884 (9th Cir.1992); Concerned Citizens v. Hardee County, 906 F.2d 524 (11th Cir.1990); Brewer v. Ham, 876 F.2d 448 (5th Cir.1989); Overton v. City of Austin, 871 F.2d 529 (5th Cir.1989); Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); Velasquez v. City of Abilene, 725 F.2d 1017 (5th Cir.1984); Jones v. City of Lubbock, 727 F.2d 364 (5th Cir.), reh'g denied, 730 F.2d 233 (5th Cir.1984); DeBaca v. County of San Diego, 794 F.Supp. 990 (S.D.Cal.1992) aff'd without op., 5 F.3d 535 (9th Cir.1993); Romero v. City of Pomona, 665 F.Supp. 853 (C.D.Cal.1987), aff'd, 883 F.2d 1418 (9th Cir.1989); Latino Political Action Comm. v. City of Boston, 609 F.Supp. 739 (D.Mass.1985), aff'd 784 F.2d 409 (1st Cir.1986); League of United Latin Am. Citizens v. Midland Indep. Sch. Dist., 648 F.Supp. 596 (W.D.Tex.1986), aff'd, 829 F.2d 546 (5th Cir.1987); Campos v. City of Baytown, 696 F.Supp. 1128 (S.D.Tex.1987), aff'd, 840 F.2d 1240 (5th Cir.) reh'g denied, 849 F.2d 943 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); Emison v. Growe, 782 F.Supp. 427 (D.Minn.1992), rev'd and remanded on other grounds, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993); Seamon v. Upham, 536 F.Supp. 931 (E.D.Tex.), vacated, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725, on remand, 536 F.Supp. 1030 (E.D.Tex.), reh'g denied, 456 U.S. 938, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982); Knox v. Milwaukee Bd. of Election Comm'rs, 607 F.Supp. 1112 (E.D.Wis.1985)
 
 
 [5]
 Badillo, 956 F.2d at 891; Concerned Citizens v. Hardee County Bd. of Comm'rs, 906 F.2d at 526; Brewer v. Ham, 876 F.2d at 451-56; Overton, 871 F.2d at 538; Skorepa v. City of Chula Vista, 723 F.Supp. 1384, 1390 (S.D.Cal.1989); Romero, 665 F.Supp. at 864-66, aff'd 883 F.2d 1418 (9th Cir.1989)
 
 
 [6]
 But see Justice Marshall's dissent:
 For it must be remembered that, during most of the past 200 years, the Constitution as interpreted by this Court did not prohibit the most ingenious and pervasive forms of discrimination against the Negro. Now, when a State acts to remedy the effects of that legacy of discrimination, I cannot believe that this same Constitution stands as a barrier.
 
 
 [7]
 Chief Judge Emeritus of the United States Court of Appeals for the Third Circuit
 
 
 [8]
 A "quadroon" is "a person of quarter Negro ancestry." Webster's Third New International Dictionary, Unabridged 1857 (1971). It follows that an "octoroon" is "a person of one-eighth Negro ancestry." Id. at 1562. These types of racial classifications were commonplace in early American history as exemplified by the plaintiff in Plessy v. Ferguson who was denied a seat in a railway coach reserved for white passengers only, because he was "seven eighths Caucasian and one eighth African blood." Plessy v. Ferguson, 163 U.S. 537, 541, 16 S.Ct. 1138, 1139-40, 41 L.Ed. 256 (1896)
 
 
 [9]
 Again, Justice Marshall explained the denial of the American dream to African-Americans in Bakke, stating:
 [T]he racism of our society has been so pervasive that none regardless of wealth or position, has managed to escape its impact. The experience of Negroes in America .... is not merely the history of slavery alone but also that a whole people were marked as inferior by the law. And that mark has endured. The dream of America as the great melting pot has not been realized for the Negro; because of his skin color he never even made it into the pot.
 Regents of Univ. of California v. Bakke, 438 U.S. 265, 400-01, 98 S.Ct. 2733, 2804-05, 57 L.Ed.2d 750 (1978).